(No. 13018.—Reversed and remanded.)

JOSEPH M. LAUGHLIN, Defendant in Error, *vs.* WILLIAM M. HOPKINSON, Plaintiff in Error.

*Opinion filed February 18, 1920—Rehearing denied April 9, 1920.*

1. APPEALS AND ERRORS—*Supreme Court cannot review controverted questions of fact.* In an action for fraud and deceit the judgment of the Appellate Court on controverted questions of fact which have been properly submitted to the jury is conclusive upon the Supreme Court.

2. EVIDENCE—*when copy of letter is not admissible in an action for fraud.* In an action for fraud and deceit alleged to have been perpetrated by the defendant, who sold to the plaintiff a half interest in a clothing store, a letter written by a former employee in the store to another employee impliedly charging the vendor with fraudulent practices is not admissible; nor is a copy of the letter which the plaintiff secured and showed to the defendant during a conversation before the trial.

3. INSTRUCTIONS—*instruction should not leave jury to decide what are the material allegations of the declaration.* The court should inform the jury, by proper instructions, as to what material facts must be found to authorize a recovery, but an instruction which directs the jury to find a verdict for the plaintiff if the material allegations of the declaration are proved leaves the jury to decide, as a matter of law, what are the material allegations, and is erroneous.

4. INTEREST—*general rule as to when damages should include interest.* Interest will be allowed when the demand is of such a nature that its exact pecuniary amount can be ascertained by computation and when the time from which interest must run, if allowed, can be ascertained, but the defendant is not in default as to interest where the amount due cannot be computed.

5. SAME—*when interest should not be allowed in an action for fraud and deceit.* In an action for fraud and deceit brought against a defendant who sold the plaintiff one-half interest in a clothing store and who is alleged to have misrepresented the value of the business, interest should not be allowed the plaintiff, where the damages are not only unliquidated but are wholly incapable of being ascertained by computation. (*Schwitters* v. *Springer,* 236 Ill. 271, distinguished.)

6. DAMAGES—*when exemplary damages are recoverable in action for fraud and deceit.* In ordinary cases exemplary damages will

not be allowed in actions for fraud and deceit, but such damages are properly recoverable where they result from willful, wanton and grossly fraudulent representations or the wrong involves some violation of duty springing from a relation of trust or confidence.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. S. C. STOUGH, Judge, presiding.

CHARLES B. STAFFORD, and COOKE, SULLIVAN & RICKS, (GEORGE A. COOKE, of counsel,) for plaintiff in error.

LEWIS F. JACOBSON, (DAVID F. ROSENTHAL, of counsel,) for defendant in error.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, William M. Hopkinson, for several years before the occurrence of the transaction out of which this litigation grows, was a traveling salesman for a wholesale clothing house. His territory included Emmetsburg, Iowa, and it was there that he met defendant in error, Joseph M. Laughlin. Laughlin was a partner in a retail clothing store in Emmetsburg and was a customer of Hopkinson. On his June, 1908, trip to Emmetsburg, Hopkinson, after selling a bill of goods to Drybread & Laughlin, showed them a picture of a retail clothing store which he owned at Toledo, Ohio. He represented it to be one of the finest retail clothing stores west of New York, and that by a special method of selling goods he was getting profits of 100 per cent and had made $3000 in the four months of spring trade. A few days after this conversation, June 13, 1908, Hopkinson wrote Laughlin that his store was making him lots of money; that he had made $300 net profits the week before; that the people he had working for him were not to be trusted, and that he was looking for some trustworthy person to buy an interest in the business. Up to this time

292 — 6

nothing had been said about Laughlin buying the store. Laughlin answered this letter immediately, stating, among other things, "I have been crazy thinking about your shop ever since you left here." As a result of this and other correspondence Laughlin went to Toledo, where he was met by Hopkinson. He was taken to the store and there met Drohen and DeWitt, then clerks in Hopkinson's employ but formerly the owners of the business. Hopkinson represented to Laughlin that one or both of these men were stealing from him and that he did not want them to know that Laughlin was considering buying the store. Laughlin was shown through the store and around the town of Toledo. Among other things he saw in the store was a day sales book kept by Drohen, which showed daily sales varying in amounts from $70.25 to $533.90. Laughlin went back to Emmetsburg and after discussing the matter with his partner and his family determined to buy a half interest in the store. He returned to Toledo the early part of July and was again shown the sales book, which indicated daily sales for the first five days of July, 1908, varying in amounts from $111.50 to $754.80. An invoice was made by Hopkinson and Laughlin of the merchandise and fixtures of the store, showing the total to be $12,346.34. In this invoice was included an item for fixtures of $5660.61. On July 10, 1908, Laughlin paid $6173.17 for a half interest in the store and immediately took charge of the store and managed it for the remainder of the year. A corporation was formed soon after Laughlin purchased a half interest in this business. Some six weeks after Laughlin had been in full charge and control of the store, his brother, with Laughlin's knowledge and approval, bought part of Hopkinson's stock, paying Hopkinson $75 a share for stock of the par value of $50. September 22, 1908, Laughlin in a letter to Hopkinson said, among other things, "I would not sell my half interest in the business for anything," and on October 13 wrote, "This place is worth $30,000 to-night."

Friction arose between Laughlin and his brother, and Laughlin had some correspondence with Hopkinson regarding the purchase of the brother's stock for the purpose of getting the brother out of the business. On December 2 Laughlin wrote, among other things: "For heaven's sake take Lou's stock off his hands. I hate to say it about my own brother, but you know that Lou's place is not in a clothes shop, and especially with me. Now, I do not want to get out myself, as we have the only location in the country." Business was poor and Laughlin became discouraged. The daily sales subsequent to July 10 (the time when Laughlin took charge of the business) varied in amounts from $8.50 to $277. About the first of December Laughlin discovered that the fixtures had not cost $5660.61 as invoiced, but had cost only $1404. Matters went from bad to worse, and after several conferences between the parties Laughlin disposed of the fixtures and the merchandise and deposited the $1900, which then represented the total assets of the company, in a bank at Emmetsburg to the credit of the company. Laughlin brought this action for fraud and deceit against Hopkinson and recovered a judgment against Hopkinson for $15,000, which, on appeal to the Appellate Court for the First District, was affirmed. Pursuant to a writ of *certiorari* granted by this court this cause is brought here to review the judgment of the Appellate Court.

The facts in this case are much in dispute and the evidence on practically all material matters is contradictory. Laughlin claims that the false representations were even more aggravated than we have set them out above, while Hopkinson contends that many of the representations set out above were not made at all. For instance, Laughlin testifies that Hopkinson showed him the record of daily sales and represented them to be authentic, while Hopkinson denies any knowledge of the sales book and testifies that it was kept by Drohen, and that if the statements in the daily sales book were not true he was not responsible for their

falsity. The evidence on practically all the material questions being contradictory, the issues were properly submitted to the jury. We are not authorized to review or to determine contested questions of fact. The judgment of the Appellate Court as to these questions must necessarily be taken as conclusive upon this court, and will be so regarded in our consideration and discussion of the questions of law arising upon the record.

Several questions are presented with respect to the action of the trial court in the admission and exclusion of evidence. The only question on the admission and exclusion of evidence that requires attention here is regarding the admission in evidence of a copy of a letter from Drohen to DeWitt. When Laughlin took charge of the store he took Drohen's place therein but kept DeWitt as an employee. In a letter written December 3, 1908, Drohen said to DeWitt: "Received your letter and am not surprised that Joe is getting wise, but I don't think that he will have anything on you or me. The only thing to do is to keep quiet and not tell them anything under any circumstances, as it will not do to make yourself liable. If they ask you any questions, tell them that the business was all O. K. when you and I were there, which it was." The original letter was excluded by the court when it was offered, but a copy which Laughlin obtained from DeWitt was admitted on the ground that Laughlin showed the copy to Hopkinson and told Hopkinson how he got possession of it, and that in this conversation Hopkinson stated that he would take the store off Laughlin's hands. We are unable to see any theory upon which this letter or the copy was admissible. It does not tend in any way to prove the issues in the case, and the fact that it impliedly charged Hopkinson with fraud made its admission especially objectionable.

It is urged that the court erred in giving to the jury plaintiff's second and sixth instructions, in which the jury were told, in substance, that if the defendant made the rep-

resentations alleged in the declaration; that such representations were material; that they were false and that they induced the plaintiff to purchase, then the verdict should be for the plaintiff. The objection is that the jury were left to determine, first, what representations were alleged in the declaration; and second, what representations so alleged were material. The instructions are subject to the criticisms made. What were the material allegations of the declaration was a question of law, and it was error to submit that question to the jury. (*Endsley* v. *Johns,* 120 Ill. 469; *Toledo, St. Louis and Kansas City Railroad Co.* v. *Bailey,* 145 id. 159.) The proper method is for the court to inform the jury by the instructions, in a clear and concise manner, as to what material facts must be found to authorize a recovery. Where the jury are not only referred to the declaration to determine the issues but are instructed to find a verdict for the plaintiff if the material allegations of the declaration are proved, they are to decide, as a matter of law, what are the material allegations, and might conclude that some allegation essential and material in the law was not material or necessary to be proved to justify a recovery. *Baker & Reddick* v. *Summers,* 201 Ill. 52; *Krieger* v. *Aurora, Elgin and Chicago Railroad Co.* 242 id. 544.

One of the questions which is the basis of serious contention between the parties to this litigation is with respect to the allowance of interest. Whether interest shall or shall not be allowed in certain cases is a question by no means free from difficulty. In this case the trial court instructed the jury that in the event the jury found the defendant guilty they might assess plaintiff's damages at a sum equal to the difference shown by the evidence "between the actual market value of the property in question that the plaintiff bought at the time and place of sale and what it would have been worth had the representations of the defendant been true as alleged in the declaration, together with interest thereon at five per cent from date of the purchase to the

date of trial." Plaintiff in error contends that the damages claimed being unliquidated, interest was not allowable thereon. While it is true that the most general classification of causes of action with reference to interest is into liquidated and unliquidated demands, this classification is not without its exceptions. That there is a broad general distinction between a claim sounding in damages and entirely unliquidated and what is called a liquidated demand is not to be denied. The objection to this classification lies not only in its difficulty of application, but also in its unfairness. There is no reason why the damages to be paid by the defendant should be mitigated or reduced by the circumstance that his tort was of such an aggravated or cunningly perfidious character as to make a liquidation of the claim against him difficult. The better rule, we think, is that interest will be allowed when the demand is of such a nature that its exact pecuniary amount can be ascertained by computation and when the time from which interest, if allowed, must run can be ascertained. Interest is given from the time when the defendant should have paid the amount due, and consequently, unless the amount due is or can be ascertained the defendant is not in default. Generally speaking, interest cannot be recovered where the damages are in their nature unliquidated, until the amount of the damages is ascertained. (*Geohegan* v. *Union Elevated Railroad Co.* 266 Ill. 482.) It would seem, in principle, that in order to recover interest there must be a fixed determinate amount which could have been tendered and interest thereby stopped.

Defendant in error relies upon *Schwitters* v. *Springer,* 236 Ill. 271, where we said: "The measure of damages for the wrongful conversion of goods is the value of the goods at the time of the conversion, with legal interest. (*Janeway* v. *Burton,* 201 Ill. 78.) In an action on the case for fraudulent representations in the sale of property the measure of damages is the difference between the value of the prop-

erty as it is and what it would be worth if the representa-
tions had been true." It is contended that by this statement
this court laid down the rule that interest might be recov-
ered in all actions for fraud and deceit. It is urged that
the Appellate Court of this State in many cases has so
interpreted this decision, and that its construction of the
decision and the interest statutes of this State should be
adopted. In *Schwitters* v. *Springer, supra,* the plaintiff by
false and fraudulent representations had been induced to ex-
change 800 acres of Colorado land for two notes for $1000
each, both worthless. We there held that plaintiff was en-
titled to recover an amount equal to the face value of the
notes at the time he received them, together with legal in-
terest thereon to the time of the trial. By the payment of
the face value of the notes the defendant in that case could
have discharged himself from all obligation to the plaintiff.
The amount of damages was ascertainable, and so the case
is clearly distinguishable from the case at bar. In this case
Hopkinson did not represent the store and business to be
of any definite value but the value as represented must be
ascertained by calculation from the representations made.
In other words, the question is, what would be the value
of a business which would make a net return of $3000 in
four months of time? A hypothetical question including all
of the elements contended for by Laughlin was submitted
to two witnesses who qualified as experts, and it was stated
by them as their opinion that such a business would be
worth $20,000. Laughlin paid slightly over $6000 for a
half interest in this business, and it is the contention of
defendant in error that this half interest was then worth
less than $4000. It is therefore apparent that the damages,
if any, were not only unliquidated but were wholly incapable
of being ascertained by computation. There was no alter-
native, therefore, for the defendant except to wait until a
jury had determined the amount of damages, if any, before
making payment or before making tender of the amount

due. The court committed reversible error in the giving of this instruction.

It is further contended that the court erred in giving the sixth instruction, in which the jury were told that if they believed, "from a preponderance of the evidence, under the instructions of the court, that the defendant acted knowingly, willfully, fraudulently, maliciously and deceitfully in causing such actual damage to the plaintiff, if any, then, in fixing the amount of the plaintiff's damages, if any, you are not confined to the actual damages shown by the evidence, if any, but may, in your discretion, award and include in your verdict as punitive or exemplary damages such further sum, if any, as in your judgment is right and proper in view of all the evidence and instructions of the court." Whether or not exemplary damages are recoverable in this class of cases is, so far as we are aware, a question of first impression in this court. We said *arguendo* in *City of Chicago* v. *Martin,* 49 Ill. 241 : "Generally, where gross fraud, malice or oppression appears, the jury are not bound to adhere to a strict line' of compensation, but may, in the shape of damages, impose a punishment on the defendant and make an example to the community. These are the elements of vindictive actions, so-called, in which juries are allowed to give such damages as shall not only compensate the plaintiff but operate as a punishment to the defendant and tend to deter him and others from the commission of similar enormities." And in *Consolidated Coal Co.* v. *Haenni,* 146 Ill. 614 : "Exemplary damages are given as a punishment where torts are committed with fraud, actual malice or deliberate violence or oppression, or where the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others." In *Platt* v. *Brown,* 30 Conn. 336, which was an action on the case for false warranty and deceit in the sale of a horse, the court said that "in actions of this sort, where the plaintiff recovers on the ground that he has been made the victim of

gross and willful fraud, the jury are at liberty to give, and the course of our decision has been rather to encourage them in giving, what are sometimes called vindictive or exemplary damages." So, also, in *Nye* v. *Merriam,* 35 Vt. 438, it is held that exemplary damages are allowable in an action on the case for deceit when the evidence tends to show 'that the defendant willfully proposed to deceive and defraud the plaintiff. In ordinary cases a recovery of exemplary damages will not be allowed in an action of deceit, but such damages may be allowed where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness and calling for the extension of the doctrine. (20 Cyc. 142; 12 Am. & Eng. Ency. of Law,—2d ed.—26; 1 Sedgwick on Damages,—9th ed.— secs. 347, 367.) Exemplary damages are properly recoverable in an action for fraud and deceit where the false representations are wantonly and designedly made. (*Kluge* v. *Ries,* (Ind.) 117 N. E. 262; *Mowes* v. *Robbins,* (Ind.) 120 N. E. 51; *Western Cottage Piano and Organ Co.* v. *Anderson,* (Tex.) 101 S. W. 1061; *Mossop* v. *Zapp,* (Tex.) 189 S. W. 979; *Kujek* v. *Goldman,* (N. Y.) 44 N. E. 773; *Cady* v. *Case,* (Kan.) 26 Pac. 448.) We are unable to see, in principle, why this is not the true and correct rule. Where damages result from willful, wanton and grossly fraudulent representations, we think it proper that the jury should be permitted to inflict damages for example's sake and by way of punishment to the defendant.

For the errors hereinbefore pointed out, the judgment of the Appellate Court must be reversed, and the cause is accordingly remanded to the circuit court of Cook county for a new trial.    *Reversed and remanded.*